ORIGINAL
FILED

**GLANCY BINKOW & GOLDBERG LLP** ~7 PM 3: 24
Lionel Z. Glancy (SBN #134180)
Michael Goldberg (SBN # 188669)          RICHARD W. WIEKING
1801 Avenue of the Stars, Suite 311          CLERK
Los Angeles, CA 90067                    U.S. DISTRICT COURT
                                         NO. DIST. OF CA S.J.
Telephone: (310) 201-9150
Fax:  (310) 201-9160

**THE ROSEN LAW FIRM, P.A.**                E-FILING
Laurence M. Rosen (SBN# 219683)
Phillip Kim
350 Fifth Avenue, Suite 5508                ADR
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827

Attorneys for Plaintiff

<div style="writing-mode: vertical-lr">FILED BY FAX
PURSUANT TO LOCAL RULES
WESTERN ATTORNEY SERVICES</div>

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

# C07 No. 02986 WHA

| | |
|---|---|
| DANIEL FEUER, individually and on behalf of all others similarly situated, | )<br>)<br>) |
| Plaintiff, | ) |
| vs. | ) |
| TELIK, INC., MICHAEL M. WICK, M.D., and CYNTHIA BUTITTA, | )<br>)<br>) |
| Defendants. | )<br>)<br>)<br>) |

<u>CLASS ACTION</u>

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

<u>DEMAND FOR JURY TRIAL</u>

Plaintiff, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants,

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    0

1   alleges the following based upon personal knowledge as to himself and his
2   own acts, and information and belief as to all other matters, based upon,
3   *inter alia*, the investigation conducted by and through his attorneys, which
4   included, among other things, a review of the defendant's public documents,
5   conference calls and announcements made by defendants, United States
6   Securities and Exchange Commission ("SEC") filings, wire and press
7   releases published by and regarding Telik, Inc. ("Telik", or the "Company"),
8   securities analysts' reports and advisories about the Company, and
9   information readily obtainable on the Internet.   Plaintiff believes that
10  substantial evidentiary support will exist for the allegations set forth herein
11  after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

12
13      1.      This is a federal securities class action on behalf of a class
14  consisting of all persons other than defendants who purchased the common
15  stock of Telik from March 27, 2003 through and including June 4, 2007,
16  including purchasers in the Company's November 5, 2003 $172.5 million
17  stock offering ("2003 Offering") and the Company's January 28, 2005 $159
18  million stock offering ("2005" Offering"), seeking to recover damages
19  caused by defendants' violations of federal securities laws and pursue
20  remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

21      2.      The crux of plaintiff's claim is that defendants intentionally
22  and materially misled the investing public about the Company's lead drug
23  product candidate TELCYTA and that the Company concealed from
24  investors the results of the recent phase III trials for TELCYTA
25  demonstrated that patients who took the drug died much sooner than
26  patients on standard chemotherapy.

27
28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    1

## JURISDICTION AND VENUE

3. The claims asserted herein arise under and pursuant to Sections 10(b), and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and Sections 11, 12 (a)(2) and 15 of the Securities Act.

4. This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

5. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) and Section 22 of the Securities Act. Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

6. In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

7. Plaintiff Daniel Feuer, as set forth in the accompanying certification, incorporated by reference herein, purchased Telik securities at artificially inflated prices during the Class Period and has been damaged thereby.

8. Defendant Telik is Delaware Corporation with its principal executive offices located 3165 Porter Drive, Palo Alto, CA 94304. According to the Company's Form 10-K filed with the SEC for fiscal year 2006, Telik is a biopharmaceutical company working to discover, develop and commercialize innovative small molecule drugs to treat diseases. The Company has never received any revenues from the commercial sale of its

1   products.  The Company's lead product candidate, TELCYTA, purports to
2   be a small molecule cancer drug product candidate designed to be activated
3   in cancer cells.  During the Company's common stock is listed on the
4   NASDAQ, under ticker "TELK".

5          9.     Defendant Michael M. Wick, M.D. ("Wick") was, at all
6   relevant times herein, the Company's Chairman, CEO, and President.

7          10.    Defendant Cynthia Butitta ("Butitta") was, at all relevant times
8   herein, the Company's Chief Operating Officer and Chief Financial Officer.

9          11.    Wick and Butitta are collectively referred hereinafter as the
10  "Individual Defendants."

11         12.    During the Class Period, each of the Individual Defendants, as
12  senior executive officers and/or directors of Telik and its subsidiaries and
13  affiliates, were privy to non-public information concerning its business,
14  finances, products, markets and present and future business prospects via
15  access to internal corporate documents, conversations and connections with
16  other corporate officers and employees, attendance at management and
17  Board of Directors meetings and committees thereof and via reports and
18  other information provided to them in connection therewith.  Because of
19  their possession of such information, the Individual Defendants knew or
20  recklessly disregarded the fact that adverse facts specified herein had not
21  been disclosed to, and were being concealed from, the investing public.

22         13.    Because of the Individual Defendants' positions with the
23  Company, they had access to the adverse undisclosed information about the
24  Company's business, operations, operational trends, financial statements,
25  clinical trial information, markets and present and future business prospects
26  via access to internal corporate documents (including the Company's
27  operating plans, budgets and forecasts and reports of actual operations
28  compared thereto), conversations and connections with other corporate

officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

14.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public statements, public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers and directors of Telik and its subsidiaries and affiliates, by virtue of their positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, clinical trials, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

15.    As officers, directors and controlling persons of a publicly-held company whose securities were and are registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-

1    issued statements that had become materially misleading or untrue, so that
2    the market price of the Company's publicly-traded securities would be based
3    upon truthful and accurate information.    The Individual Defendants'
4    misrepresentations and omissions during the Class Period violated these
5    specific requirements and obligations.

6       16.    The Individual Defendants participated in the drafting,
7    preparation, and/or approval of the various public and shareholder and
8    investor reports and other communications complained of herein and were
9    aware of, or recklessly disregarded, the misstatements contained therein and
10   omissions therefrom, and were aware of their materially false and
11   misleading nature.  Because of their Board membership and/or executive
12   and managerial positions with Telik, each of the Individual Defendants had
13   access to the adverse undisclosed information about Telik's clinical trials,
14   business prospects, and performance as particularized herein and knew (or
15   recklessly disregarded) that these adverse facts rendered the positive
16   representations made by or about Telik and its business issued or adopted
17   by the Company materially false and misleading.

18      17.    The Individual Defendants, because of their positions of
19   control and authority as officers and/or directors of the Company, were able
20   to and did control the content of the various SEC filings, press releases and
21   other public statements pertaining to the Company during the Class Period.
22   Each Individual Defendant was provided with copies of the documents
23   alleged herein to be misleading prior to or shortly after their issuance and/or
24   had the ability and/or opportunity to prevent their issuance or cause them to
25   be corrected.  Accordingly, each of the Individual Defendants is responsible
26   for the accuracy of the public reports and press releases detailed herein and
27   is therefore primarily liable for the representations contained therein.

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    5

1     18.    Each of the defendants is liable as a participant in a fraudulent

2  scheme and course of business that operated as a fraud or deceit on

3  purchasers of Telik securities by disseminating materially false and

4  misleading statements and/or concealing material adverse facts.  The

5  scheme (i) deceived the investing public regarding Telik's clinical trials,

6  business, operations, management and the intrinsic value of Telik securities;

7  and (ii) caused Plaintiff and other members of the Class to purchase Telik

8  securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

19.    Plaintiff brings this action as a class action pursuant to Federal

Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of

all persons who purchased shares of Telik during the Class Period and who

were damaged thereby.  Excluded from the Class are defendants, the

officers and directors of the Company, at all relevant times, members of

their immediate families and their legal representatives, heirs, successors or

assigns and any entity in which defendants have or had a controlling

interest.

20.    The members of the Class are so numerous that joinder of all

members is impracticable.  Throughout the Class Period, Telik's securities

were actively traded on the NASDAQ.  While the exact number of Class

members is unknown to Plaintiff at this time and can only be ascertained

through appropriate discovery, Plaintiff believes that there are at least

hundreds of members in the proposed Class.  Members of the Class may be

identified from records maintained by Telik or its transfer agent and may be

notified of the pendency of this action by mail, using a form of notice

customarily used in securities class actions.

21.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

22.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

23.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

>   (a)     whether the federal securities laws were violated by defendants' acts as alleged herein;
>
>   (b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, clinical trials, operations and management of Telik;
>
>   (c)     whether defendants acted knowingly or recklessly in making materially misleading representations or omitting to state material facts during the Class Period;
>
>   (d)     whether the market prices of the Company's securities were artificially inflated or distorted during the Class Period because of defendants' conduct complaint of herein; and
>
>   (e)     to what extent the members of the Class have sustained damages and the proper measure of damages.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

25.     During the Class Period, defendants issued materially false and misleading statements and/or failed to disclose material facts that rendered their statements materially false and misleading concerning the Company's conduct of the FDA clinical trials of TELCYTA and the safety of the Company's lead drug candidate TELCYTA. As alleged herein, Defendants knowingly and/or recklessly concealed that in the Company's Phase III Clinical Trials patients administered TELCYTA died much sooner than the control group patients on standard chemotherapy; made materially false and misleading statements about the conduct of the clinical testing of TELCYTA; and materially misled the investing public about the TELCYTA's prospects.

26.     The Class Period begins on March 27, 2003 when the Company announced that it had initiated a controlled Phase III Registration Trial of TLK286 (ASSIST-1 Trial) in ovarian Cancer patients. The release touted the drug's prior performance in the Phase II clinical trial and other purported benefits. The press release states in relevant part:

> The multinational trial, designated the ASSIST-1 (Assessment of Survival In Solid Tumors-1) trial, is expected to enroll approximately 440 women. Patients will be randomized to a TLK286 treatment group, or to a control group receiving either Doxil® or Hycamtin®, drugs that are commonly used in the third-line ovarian cancer setting. The study is designed to evaluate whether TLK286 treatment reduces the risk of death, leading to an increase in survival, as compared to the control group.

Results from a Phase 2 single agent study of TLK286 in ovarian cancer were presented at the American Society of Clinical Oncology meeting in May 2002 and at the EORTC/NCI/AACR meeting in November 2002. In this trial, objective tumor responses were observed and median patient survival was estimated at 17 months by Kaplan-Meier analysis.

"Ovarian cancer has the highest mortality rate of all gynecologic malignancies. There is an urgent need for new treatment alternatives since approximately 75% of new cases of ovarian cancer are diagnosed at an advanced stage," said Gail L. Brown, M.D., senior vice president and chief medical officer. "The objective responses and survival benefit observed with TLK286 in our Phase 2 ovarian cancer trials, the clinical activity reported in other cancers, including non-small cell lung, breast and colorectal, as well as the tolerability profile seen in more than 350 patients, provide a strong foundation for this Phase 3 trial."

                    *        *        *        *

TLK286 is a small molecule prodrug which is activated by GST P1-1, an enzyme present in higher levels in many human cancers than in normal tissues. Upon activation, TLK286 initiates an intracellular process known as apoptosis, or programmed cell death. Telik has retained worldwide commercialization rights to TLK286.

27.    On April 24, 2003 the Company issued a press release announcing its Q1 2003 results. The press release touted the Company's publication of "new preclinical" data on TELCYTA.

28.    On May 31, 2003 the Company presented some findings and information at the American Society of Clinical Oncology, representing that the Company's in-progress follow-up clinical trial on advanced lung-cancer patients given TELCYTA confirmed the Company's earlier data that TELCYTA increased survival times.   Similar data was provided with respect to Ovarian cancer as well. In summing up the results, the Company stated that "TELCYTA treatment was well-tolerated, with most side effects mild and reversible"

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    9

29.    On June 1, 2003 the company issued a press release announcing reiterating and elaborating on the May 31, 2003 presentation. It reiterated the Company's prior announcements and stated "[I]n these clinical trials, as in the previous clinical trials, TELCYTA treatment was well-tolerated, with most side effects mild and reversible."

30.    During a conference call on July 30, 2003 defendant Wick touted the veracity of the Company's representations of the Phase II study results of TELCYTA. He proclaimed, that while Phase II clinical trials do not generally call for "strict" verified response criteria, such measures were employed in the Phase II trials as part of the Company's "strategy of reducing risks going forward by conducting Phase 2 trials to Phase 3 standards."

31.    On September 3, 2003 the Company issued a press release announcing that it had received "Fast Track" designation by the FDA for TELCYTA to treat ovarian cancer, because TELCYTA had demonstrated the potential to address unmet medical needs.

32.    On October 29, 2003 the Company issued a press release announcing its Q3 2003 results. The press release reiterates the information about TELCYTA results set forth above. The Company also reported interim data from three Phase 1-2a clinical trial in which TELCYTA was used in combination with standard chemotherapy drugs. According to the Company: "[r]esults indicate that the combinations were well tolerated at all doses tested."

33.    That day, the Company also announced that it would complete an offering of six million shares of its stock, with five million shares to be issued and sold by the Company, and another million being stock being sold by one of Telik's early venture capital investors. On November 6, 2003, the Company announced its registration statement had been declared effective

1  and priced the 2003 Offering at $20 a share. In total along with the
2  underwriter's allotment of additional shares, 8.625 million shares would be
3  sold in the 2003 offering, of which 7.625 million of that were sold by Telik
4  for total gross proceeds of $172.5 million.

5     34.    The Prospectus filed in connection with the 2003 Offering
6  contained the following materially false and misleading statements:

(a) Telik had "initiated a Phase 3 registration trial of TELCYTA for the treatment of ovarian cancer in March 2003" was materially false and misleading as the Assist-1 study was not "adequate and well-controlled" and thus its results would not be accepted by the FDA as "substantial evidence of TELCYTA's efficacy;

(b) "Results from .... trials indicat[ing] that TELCYTA [was] generally well tolerated, with mostly mild to moderate side effects" was materially false and misleading because it concealed that subjects in the Phase II testing has experienced an unacceptably high level of side effects; and

(c) Statements describing the June 2003 ASCO meeting presentations as set forth above were also materially false and misleading because the subjects in the Phase II testing has unacceptably high side effects.

35.    On December 2, 2003 the Company announced it received "Fast Track" designation from the FDA for TELCYTA for the treatment of non-small cell lung cancer, because TELCYTA had demonstrated the potential to address unmet medical needs.

36.   On February 19, 2004 the Company issued a press release announcing its Q4 and FY 2003 results. The announcement summed up the Company's prior announcements regarding TELCYTA set forth above.

37.   During the conference call that followed, defendant Wick further touted the Company's prior results concerning TELCYTA: that TELCYTA was "well tolerated across all" of the Company's trials, that earlier trials were designed to ensure positive as well as negative effects of TELCYTA could attributable to the drug, and other further statements to assure investors about the legitimacy of the Company's data, the conduct of the Company's trials, and the safety and efficacy of TELCYTA.

38.   On April 29, 2004 the Company issued a press release announcing its Q1 2004 results. The announcement reiterated and summed upped the Company's prior statements.

39.   During the conference call that followed, defendant Wick continued to assure investors about the TELCYTA's safety and efficacy. He again stated that TELCYTA, "across" the Company's trials, demonstrated anti-tumor activity, continued outstanding tolerability, and a favorable impact on survival. Wick also told investors that "very strong" data received by the Company would permit the "the attendant acceleration of market opportunity and revenue." Wick also stated that since the Phase III trials of TELCYTA were "state of the art" with all the "bells and whistles"—which included "interim looks" and "independent data safety monitoring boards," defendants would be able to "communicate with the street if any of those interim looks changes in a material way or [the Company's] guidance for that trial, either in terms of size, of timing, or [expected finish" changed, and that "so far, non of these ha[d] occurred."

40.   On November 4, 2004 the Company issued a press release announcing its Q3 2004 results. The press release states in relevant part:

TELCYTA plus carboplatin in platinum refractory or resistant ovarian cancer: a total of 53 patients have been enrolled in the trial, 27 of whom were evaluable for efficacy at the time of analysis. The objective response rate by RECIST is 54%, including 4 durable complete responses and 10 partial responses that have been independently reviewed. Objective responses were observed at all participating institutions including the Massachusetts General Hospital, Dana-Farber Cancer Institute and University of Texas M.D. Anderson Cancer Center. Based on these data, Telik plans to initiate the ASSIST-3 Phase 3 trial, to evaluate the combination of TELCYTA plus carboplatin versus Doxil in the second line treatment of platinum refractory or resistant ovarian cancer.

TELCYTA plus Doxil in platinum refractory or resistant ovarian cancer: a total of 51 patients have been enrolled in the trial, including 12 treated in a separate dose-escalation phase. At the time of analysis, 19 patients in Phase 2 were evaluable for efficacy. The objective response rate by RECIST is 42%, with eight partial responses that have been independently reviewed.

41.     On January 24, 2005, the Company announced it planned to conduct an offering of five million shares of its stock which was priced on January 28, 2005 at $18.75 per share when the Company's registration statement was declared effective.     Along with the underwriters overallotment of shares, over 8 million shares were issued and sold by the Company in the 2005 Offering for gross proceeds of $150.9 million.

42.     The Prospectus in connection with the 2005 offering contained the following materially false and misleading statements:

> (a) "When TELCYTA binds to GST P1-1 inside a cancel cell, a chemical reaction occurs, releasing fragments of TELCYTA that caused programmed cancer cell death, or apoptosis";
>
> (b) TELCTYA had "shown clinical antitumor activity alone and in combination in multiple Phase 2 trials in

refractory or resistant ovarian, non-small cell lung, breast and colorectal cancer";

(c) "Results for these clinical trials indicate that TELCTYA is generally well-tolerated, with mostly mild to moderate side effects"; and

(d) Company's "strategy" was to "develop product candidates with a clear path to regulatory approval and the potential to show early evidence of clinical efficacy," allowing the Company to "reduce the risk inherent in drug discovery and accelerate the commercialization of [its] drug candidates."

43.    On February 24, 2005 the Company issued a press release announcing its Q4 2004 and FY 2004 results.  The press release states in relevant part:

In February 2005, the company completed a follow-on public offering of 8,050,000 shares of its common stock, resulting in gross proceeds to the company of $150,937,500.

Highlights during 2004 included:

Enrollment was completed in the ASSIST-1 Phase 3 clinical trial of TELCYTA for third-line platinum refractory or resistant ovarian cancer.

The ASSIST-2 Phase 3 clinical trial of TELCYTA was initiated for third-line platinum resistant non-small cell lung cancer.

A third Phase 3 clinical trial, ASSIST-3, was initiated using the combination of TELCYTA plus carboplatin for second-line platinum refractory or resistant ovarian cancer.

Positive results from three Phase 2 clinical trials for TELCYTA in combination with standard chemotherapy in ovarian and non-small cell lung cancer were reported at the American Society of Clinical Oncology annual meeting. Additional positive data from the ovarian cancer trials were reported at the International Gynecologic Cancer Society meeting.

Two additional Phase 2 clinical trials were initiated for TELCYTA, in the treatment of advanced non-small cell lung cancer patients who have not previously received chemotherapy. One of the trials is in combination with cisplatin, and the other is in combination with carboplatin and paclitaxel.

Preclinical results that support the advancement of TELCYTA clinical development to front-line and second-line treatment settings were reported at the American Association for Cancer Research annual meeting.

Positive interim data from the Phase 2 clinical trial of TELINTRA for the treatment of myelodysplastic syndrome were reported at the annual meeting of the American Society of Hematology.

44.    On February 9, 2006 the Company issued a press release announcing its Q4 and FY 2005 results. The press release states in relevant part:

2005 highlights included:

The advancement of our lead product candidate, TELCYTA®, in three randomized Phase 3 registration trials and in two Phase 2 trials in first-line non-small cell lung cancer:

The ASSIST-1 Phase 3 trial completed enrollment of 440 women with platinum refractory or resistant ovarian cancer in the third-line setting. The primary endpoint for ASSIST-1 is improvement in survival.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    15.

A peer-reviewed publication describing the Phase 2 TELCYTA trial supporting the ASSIST-1 trial was published in the International Journal of Gynecological Cancer.

The ASSIST-3 trial was initiated to evaluate the combination of TELCYTA plus carboplatin in second-line platinum refractory or resistant ovarian cancer. This trial is enrolling 244 women. The primary endpoint for ASSIST-3 is objective response rate as well as progression-free survival.

The ASSIST-2 trial completed enrollment of 520 patients with platinum resistant non-small cell lung cancer in the third-line treatment setting. Improvement in survival is the primary endpoint of the ASSIST-2 trial.

Positive interim data from the multicenter Phase 2 trial of TELCYTA administered in combination with the standard regimen of carboplatin and paclitaxel in first-line non-small cell lung cancer were reported at the 11th World Conference on Lung Cancer in July. This trial has been expanded to multiple sites and is intended to enroll approximately 100 patients.

Positive interim data from the multicenter Phase 2 trial of TELCYTA administered in combination with cisplatin, also in first-line non-small cell lung cancer, were reported at the 41st annual meeting of the American Society of Clinical Oncology and at the 11th World Conference on Lung Cancer.

Preclinical data demonstrating the ability of TELCYTA to resensitize platinum-resistant human ovarian cancer cells to platinum were reported at the American Association for Cancer Research 96th annual meeting. These data provided scientific rationale for the ASSIST-3 trial design.

Preclinical data describing the synergistic inhibitory effects of both doublet and triplet combinations of TELCYTA with platinum and taxane drugs as compared to the individual agents in human ovarian and non small cell lung cancer cells were presented at the American Association of Cancer Research 96th annual meeting. These data

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                16

provided scientific support for the Phase 2 first-line non-small cell lung cancer trials.

45.    On May 4, 2006 the Company issued a press release announcing its Q1 2006 results. The press release states in relevant part:

> Initiation of the ASSIST-5 trial: This Phase 3 trial will evaluate the combination of TELCYTA plus Doxil® to treatment with Doxil alone in women with platinum refractory or resistant ovarian cancer. Approximately 244 women are expected to be enrolled, with half randomized to each treatment arm. Trial endpoints include objective response rate, progression-free survival and overall survival.
>
> Completion of ASSIST-3 enrollment: Telik announced the completion of planned enrollment for the ASSIST-3 trial, a Phase 3 trial evaluating the combination of TELCYTA plus carboplatin to treatment with Doxil in women with platinum refractory or resistant ovarian cancer.
>
> TELCYTA presentation at the 97th annual meeting of the American Association for Cancer Research: Telik reported positive preclinical results with its lead cancer product candidate, TELCYTA (TLK286), that support TELCYTA's unique mechanism of targeted activation in cancer cells and the synergy observed when TELCYTA is administered in combination with platinum-based chemotherapeutic drugs.

46.    On September 25, 2006, the Company announced that the "pre-specified number of events ha[d] been reached on the Assist-1 Phase 3 trial in platinum refractory or resistant ovarian cancer."

47.    December 26, 2006 when the Company issued a press release announcing the preliminary results of the Company's Phase III Clinical Trials of its lead TELCYTA drug candidate. The press release states in relevant part:

Palo Alto, CA, December 26, 2006 — Telik, Inc. (Nasdaq: TELK) announced preliminary results from three separate Phase 3 clinical trials of its investigational drug TELCYTA (TLK286, canfosfamide HCl).

Non-Small Cell Lung Cancer
ASSIST-2 Trial

The ASSIST-2 trial, a 520 patient multinational, randomized study designed to evaluate TELCYTA as compared to gefitinib in the third-line therapy of advanced non-small cell lung cancer, did not achieve a statistically significant improvement in overall survival, the primary endpoint.

Platinum Refractory or Resistant Ovarian Cancer
ASSIST-1 Trial

The ASSIST-1 trial, a 440 patient multinational, randomized study designed to evaluate TELCYTA as compared to the active control agents liposomal doxorubicin or topotecan in the third-line therapy of platinum resistant ovarian cancer, did not achieve its primary endpoint of demonstrating a statistically significant improvement in overall survival for TELCYTA as compared to the active controls. While the preliminary analysis revealed a number of internal inconsistencies that need to be further investigated, resolution of these inconsistencies may not change the preliminary results.

ASSIST-3 Trial

The ASSIST-3 trial, a 244 patient randomized trial conducted in the U.S., was designed to demonstrate a statistically significant improvement in overall tumor response to the combination of TELCYTA plus carboplatin compared to liposomal doxorubicin in the second-line treatment of platinum resistant ovarian cancer. Under the trial protocol, patients were to have received treatment until tumor progression or unacceptable toxicity. However, a major discordance was observed between the clinical review of the tumor scans and the independent radiology review. Approximately 25% of the patients were discontinued prematurely from the assigned study treatment as

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    18

judged by the independent review of the scans. Therefore, the company believes the trial was compromised and may not be suitable for a regulatory submission. The company plans to meet with advisors to review the results and also to determine if any changes should be made to the protocol and/or trial conduct procedures for the ongoing ASSIST-5 trial.

Objective tumor responses were observed on the investigational arms containing TELCYTA in all three trials based on the prospective central blinded independent radiology review.

TELCYTA Safety

Preliminary analysis of the safety data from the ASSIST-1 and ASSIST-2 TELCYTA monotherapy trials indicates that TELCYTA was, as expected, generally well-tolerated. TELCYTA treatment was associated with mild to moderate nausea, vomiting and fatigue, mostly Grade 1 or 2. There were few Grade 3 or Grade 4 toxicities observed among the TELCYTA-treated patients on the ASSIST-1 and ASSIST-2 trials. Preliminary analysis of the safety data from the ASSIST-3 trial, combining TELCYTA plus carboplatin, demonstrated toxicities expected of each drug alone and no unexpected or cumulative toxicities were reported.

"We acknowledge and thank the patients and investigators who participated in these trials, and the entire Telik team for their efforts," said Michael Wick M.D., PhD Chairman and Chief Executive Officer. "These results are extremely disappointing. We are conducting additional, detailed analyses of the data from these three trials and plan to discuss those results with our advisors to determine the next development steps. We plan to present data from these trials at a scientific meeting."

48.   The announcement shocked the market and caused the Company's stock to fall.  The Company stock fell approximately $11.49 a share or 70% on December 26, 2006.

49.   This press release is also materially false and misleading because the results of the Phase III Clinical Trials demonstrated TELCYTA

to be unsafe for patients as compared to the control group. The Company concealed results showing that TELCYTA not only did not meet its primary endpoint of statistically significant improvement of overall survival, but rather demonstrated that patients administered TELCYTA died much sooner than those on standard chemotherapy.

50.    On February 22, 2007 the Company issued a materially false and misleading press release announcing its Q4 and FY ended 2006 financial results.    There is no mention whatsoever in that press release concerning the Phase III Clinical Trial results of TELCYTA.    Despite having a clear duty to update its historical statements to correct the material falsity and misleading nature of the statements concerning the safety of TELCYTA in the Phase III Clinical Trial, the Company remained silent.

51.    On February 28, 2007 the Company filed its annual report for FY 2006 on Form 10-K with the SEC.  The Form 10-K was materially false and misleading because the results of the TELCYTA Phase III Clinical Trials demonstrated it to be unsafe to patients as compared to the control group, that TELCYTA not only did not meet one of its primary endpoints of statistically significant improvement of overall survival, but rather demonstrated results that would significantly harm overall survival.  The Form 10-K states in relevant part:

On December 26, 2006 we announced preliminary results from our first three randomized TELCYTA Phase 3 registration trials. The following summarizes the preliminary results of those trials:

ASSIST-1 is a 440 patient multinational, randomized Phase 3 trial designed to evaluate TELCYTA as compared to the active control agents liposomal doxorubicin or topotecan in the third-line therapy of platinum resistant ovarian cancer. The ASSIST-1 trial did not achieve the primary endpoint of demonstrating a statistically significant improvement in overall survival for TELCYTA as compared to the

active controls. While the preliminary analysis revealed a number of internal inconsistencies that need to be further investigated, resolution of these inconsistencies may not change the preliminary results.

ASSIST-2 is a 520 patient multinational, randomized Phase 3 trial designed to evaluate TELCYTA as compared to gefitinib in the third-line therapy of advanced non-small cell lung cancer. The ASSIST-2 trial did not achieve the primary endpoint of demonstrating a statistically significant improvement in overall survival for TELCYTA as compared to the active control.

ASSIST-3 is a 244 patient randomized Phase 3 trial conducted in the U.S. designed to demonstrate a statistically significant improvement in overall objective response rate with the combination of TELCYTA plus carboplatin compared to liposomal doxorubicin in the second-line treatment of platinum resistant ovarian cancer. Under the trial protocol, patients were to have received treatment until tumor progression or unacceptable toxicity. However, a major discordance was observed between the clinical review of the tumor scans and the independent radiology review. Approximately 25% of the patients were discontinued prematurely from the assigned study treatment as judged by the independent review of the scans. Therefore, we believe the trial was compromised and may not be suitable for a regulatory submission.

Objective tumor responses were observed on the investigational arms containing TELCYTA in all three trials based on the prospective central blinded independent radiology review. Preliminary analysis of the safety data from the ASSIST-1 and ASSIST-2 trials, in which TELCYTA was administered as monotherapy, indicates that TELCYTA was generally well-tolerated. TELCYTA treatment was associated with mild to moderate nausea, vomiting and fatigue. Preliminary analysis of the safety data from the ASSIST-3 trial, combining TELCYTA plus carboplatin, demonstrated toxicities expected of each drug alone and no unexpected or cumulative toxicities were reported. Further analyses of each of these trials are underway.

52.    The Form 10-K also touted the Company's Phase 3 Assist-5 clinical trial. The Form 10-K states in relevant part:

> ASSIST-5 is a 244 patient, multinational randomized Phase 3 trial initiated in May 2006, evaluating TELCYTA in combination with liposomal doxorubicin versus liposomal doxorubicin as second line therapy in platinum refractory or resistant ovarian cancer. Enrollment is ongoing in this trial.

53.    The Form 10-K was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Wick and Butitta.

54.    On May 3, 2007, the Company issued a press release announcing its Q1 2007 financial results. The Press release touted the Company's TELCYTA Phase II Clinical trial. However, there is no mention whatsoever in that press release concerning the safety Phase III Clinical Trial results of TELCYTA. Despite having a clear duty to update its historical statements to correct the material falsity and misleading nature of the statements concerning the safety of TELCYTA in the Phase III Clinical Trial, the Company remained silent.

55.    On May 4, 2007 the Company filed its Q1 2007 quarterly report on Form 10-Q with the SEC. The Form 10-Q was materially false and misleading because the results of the TELCYTA Phase III Clinical Trials demonstrated it to be unsafe to patients as compared to the control group, that TELCYTA not only did not meet one of its primary endpoints of statistically significant improvement of overall survival, but rather demonstrated results that would significantly harm overall survival. The Form 10-K states in relevant part:

> Clinical Status
>
> TELCYTA, our lead product candidate, is a small molecule tumor-activated cancer product candidate that we are evaluating initially to

treat cancers that are resistant to standard chemotherapy drugs. On December 26, 2006, we announced preliminary results from our first three randomized TELCYTA Phase 3 registration trials, known as the ASSIST trials. The following summarizes the preliminary results of those trials:

ASSIST-1 is a 440 patient multinational, randomized Phase 3 trial designed to evaluate TELCYTA as compared to the active control agents liposomal doxorubicin or topotecan in the third-line therapy of platinum resistant ovarian cancer. The ASSIST-1 trial did not achieve the primary endpoint of demonstrating a statistically significant improvement in overall survival for TELCYTA as compared to the active controls. While the preliminary analysis revealed a number of internal inconsistencies that need to be further investigated, resolution of these inconsistencies may not change the preliminary results.

ASSIST-2 is a 520 patient multinational, randomized Phase 3 trial designed to evaluate TELCYTA as compared to gefitinib in the third-line therapy of advanced non-small cell lung cancer. The ASSIST-2 trial did not achieve the primary endpoint of demonstrating a statistically significant improvement in overall survival for TELCYTA as compared to the active control.

ASSIST-3 is a 244 patient randomized Phase 3 trial conducted in the U.S. designed to demonstrate a statistically significant improvement in overall objective response rate with the combination of TELCYTA plus carboplatin compared to liposomal doxorubicin in the second-line treatment of platinum resistant ovarian cancer. Under the trial protocol, patients were to have received treatment until tumor progression or unacceptable toxicity. However, a major discordance was observed between the clinical review of the tumor scans and the independent radiology review. Approximately 25% of the patients were discontinued prematurely from the assigned study treatment as judged by the independent review of the scans. Therefore, we believe the trial was compromised and may not be suitable for a regulatory submission.

Objective tumor responses were observed on the investigational arms containing TELCYTA in all three trials based on the prospective

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          23

central blinded independent radiology review. Preliminary analysis of the safety data from the ASSIST-1 and ASSIST-2 trials, in which TELCYTA was administered as monotherapy, indicates that TELCYTA was generally well-tolerated. TELCYTA treatment was associated with mild to moderate nausea, vomiting and fatigue. Preliminary analysis of the safety data from the ASSIST-3 trial, combining TELCYTA plus carboplatin, demonstrated toxicities expected of each drug alone and no unexpected or cumulative toxicities were reported. Further analyses of each of these trials are underway.

56.    The 10-Q also touted other clinical trials of TELCYTA, the 10-Q states in relevant part:

We also have a 244 patient, multinational randomized Phase 3 clinical trial, ASSIST-5, initiated in May 2006, evaluating TELCYTA in combination with liposomal doxorubicin versus liposomal doxorubicin as second line therapy in platinum refractory or resistant ovarian cancer. Enrollment is ongoing in this trial

In addition, we have conducted two Phase 2 clinical trials of TELCYTA for the treatment of Stage IIIb or IV non-small cell lung cancer for patients who have not previously received chemotherapy. One clinical trial is in combination with cisplatin, and the other clinical trial is in combination with carboplatin and paclitaxel. Platinum and taxane-based drug combinations are the current standard for the front-line chemotherapy of lung and ovarian cancer. In April 2007 we announced that results from the Phase 2 clinical trial of TELCYTA in combination with carboplatin and paclitaxel include statistically and clinically significant improvement in both progression-free survival and overall survival in responding patients who received TELCYTA maintenance therapy as compared with those who did not receive TELCYTA maintenance therapy.

57.    The 10-Q was signed by defendant Butitta and certified pursuant to SOX by Butitta and Wick.

58.   On June 3, 2007 the Company issued three separate press releases announcing additional findings from its Phase III clinical trials of the TELCYTA, began to reveal TELCYTA was unsafe and hazardous.

59.   The press release concerning the TELCYTA Assist-1 Trial states in relevant part:

> The trial did not meet the primary endpoint of demonstrating superiority in overall survival or the secondary endpoint of demonstrating superiority in progression-free survival on the TELCYTA arm as compared with the active control arm. Median survival on the TELCYTA arm was 8.5 months compared with 13.6 months on the active control arm (p <0.01). Median progression-free survival was 2.3 months on the TELCYTA arm compared with 4.3 months on the active control arm.

>                *     *     *     *

> TELCYTA was very well-tolerated with infrequent hematologic or non-hematologic adverse events in a heavily pretreated population.

> "The known in vitro synergism with carboplatin, paclitaxel and anthracyclines and the excellent tolerability profile of canfosfamide in heavily pretreated, third-line ovarian cancer patients support further studies with canfosfamide in combination regimens in second line therapy," said Professor Dr. Ignace Vergote, Chairman, Department of Obstetrics and Gynecology, University Hospitals Leuven, Belgium, principal investigator for the ASSIST-1 trial. Dr. Vergote also is principal investigator for the ongoing ASSIST-5 Phase 3 trial which is evaluating the combination of TELCYTA plus PLD to PLD alone in second-line platinum refractory or resistant ovarian cancer.

60.   The press release regarding the TELCYTA Assist-2 Trial states in relevant part:

> The Phase 3, international, randomized, active control study enrolled 530 patients with advanced NSCLC whose disease had progressed following first-line platinum-based therapy and a second-line

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    25

1   treatment, Two hundred sixty-five patients were randomized to
2   TELCYTA treatment and 265 patients were randomized to gefitinib.
    The two arms of the study were balanced for key NSCLC disease
3   characteristics and other prognostic or predictive factors.

4   The trial did not meet the primary endpoint of demonstrating
5   superiority in overall survival or the secondary endpoint of
    demonstrating superiority in progression-free survival for the
6   TELCYTA arm as compared with gefitinib. Median survival for the
7   TELCYTA arm was 4.6 months as compared with 6.1 months for the
8   active control arm. Median progression-free survival was 2.2 months
    for the TELCYTA arm as compared with 2.3 months for the gefitinib
9   arm:

10
11  TELCYTA was very well-tolerated with infrequent hematologic or
    non-hematologic adverse events in a heavily pretreated population.
12

13  61.     The press release regarding the TELCYTA Assist-3 Trial states
14  in relevant part:

15      The Phase 3, randomized, active control study enrolled 247 women
16      with advanced, platinum refractory or resistant ovarian cancer whose
        disease had progressed following first-line platinum-based therapy.
17      One hundred twenty-three women were randomized to treatment with
18      the combination of TELCYTA and carboplatin and 124 women were
19      randomized to treatment with pegylated liposomal doxorubicin
        (PLD). The two arms of the study were balanced for key ovarian
20      cancer disease characteristics, platinum refractory or resistant status,
21      and other prognostic or predictive factors. All patients had platinum
        refractory or resistant disease, with a platinum-free interval (PFI,
22      from the date of last treatment with platinum-based chemotherapy to
23      the date of documented disease progression) of six months or less.

24      Patients were treated until disease progression, as determined by
25      radiologic evaluations at each site, or unacceptable toxicity. A
26      central, blinded independent radiology review also was conducted.

27      Assessment of the primary endpoint, objective response rate by
28      RECIST, m ay h ave b een c ompromised b ecause a pproximately 25%

of patients were prematurely discontinued from the study for disease progression, as assessed by the independent radiology review. Median progression-free survival, the secondary endpoint of the trial, assessed by independent radiology review, was 3.5 months on both arms.

As expected with a platinum-containing regimen, there were more hematologic toxicities on the TELCYTA plus carboplatin arm as compared with the PLD arm. These toxicities were well managed with growth factor support or dose reductions as clinically appropriate. Febrile neutropenia occurred only on the PLD arm. Non-hematologic toxicities were more common on the PLD arm, also as expected. Patient-reported quality of life outcomes consistently favored the TELCYTA plus carboplatin arm over the PLD arm, although the differences were not statistically significant.

A multivariate analysis of prognostic factors was conducted including all prespecified patient characteristics and stratification factors. There were statistically significant differences between the two arms of the study in patients who had a drug-free period (DFP, from the date of last treatment with any anti-cancer treatment to the first study treatment) of greater than or equal to six months. Thirty-eight patients, 19 on each arm, had a DFP of six months or more. In this group, median progression-free survival was 3.5 months on the PLD arm versus not yet reached on the TELCYTA plus carboplatin arm (p ≤ 0.01). Median survival was 11.1 months on the PLD arm versus not yet reached on the TELCYTA plus carboplatin arm. The objective response rate (as assessed by the independent radiology review) was 31.6% on the TELCYTA plus carboplatin arm, as compared with 10.5% on the PLD arm.

"The combination of TELCYTA and carboplatin has demonstrated promise and is an active regimen in platinum refractory or resistant ovarian cancer, a significant unmet need," said Peter Rose, M.D., Section Head, Gynecologic Oncology, Cleveland Clinic, and principal investigator for the ASSIST-3 trial. "Survival follow-up in the overall trial and in the patients with a DFP of six months or more is in progress."

"New agents to treat women with advanced ovarian cancer are greatly needed, particularly for women whose disease is platinum refractory or resistant," said Sherry Salway Black, Executive Director of the Ovarian Cancer National Alliance. "While it is disappointing that this trial did not meet its primary endpoint, we are encouraged by the ongoing Phase 3 study of TELCYTA plus standard chemotherapy in the second-line therapy of ovarian cancer."

62.    The June 3, 2007 (Sunday) announcements caused the Company's stock to open on Monday June 4, 2007 down 91 cents or 15.6% lower than the prior trading day's closing price. By the end of Monday's trading the stock price had dropped even further to $4.59, down approximately $1.22 a share or 20% from the prior trading day's closing price..

63.    After market close on June 4, 2007 the Company announced that the Company that the FDA had initiated clinical hold following a presentation the Company made at the annual meeting of the American Society of Clinical Oncology. The press release states in relevant part:

PALO ALTO, Calif., June 4 /PRNewswire-FirstCall/ -- Telik, Inc. (Nasdaq: TELK - News) announced that the U.S. Food and Drug Administration (FDA) has placed a clinical hold on the Investigational New Drug (IND) application for TELCYTA® (canfosfamide HCl). The clinical hold was initiated by FDA following the presentation of TELCYTA Phase 3 clinical trial results at the annual meeting of the American Society of Clinical Oncology.

No new patients will be enrolled on TELCYTA clinical trials, and no patients currently being treated on the trials will receive additional treatment until the FDA releases the clinical hold. Telik plans to submit to the FDA additional detailed safety and other information regarding TELCYTA and meet with the FDA regarding the clinical hold as soon as possible.

The only TELCYTA clinical trial that had been open for new patient enrollment was the ASSIST-5 trial of TELCYTA plus pegylated liposomal doxorubicin (PLD) versus PLD alone in second line therapy of platinum refractory or resistant ovarian cancer. In addition, a small number of patients had continued to receive TELCYTA treatment in previously-enrolled clinical trials.

64.    Pursuant to applicable federal regulations and practices of the FDA, the FDA places clinical holds on a drug when there is cause to believe that its use in clinical testing would endanger the health or safety of a patient.

65.    This announcement caused the Company's stock to fall $1.17 a share or 25.49% on June 5, 2007.

## DEFENDANTS CAUSED PLAINTIFF'S LOSSES

66.    During the Class Period, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Telik's share price and operated as a fraud or deceit on purchasers of Telik shares by misrepresenting the Company's financial condition and business prospects. Once defendants' misrepresentations and fraudulent conduct were disclosed to the market, Telik's share price reacted negatively as the artificial inflation was removed from its share price. As a result of their purchases of Telik's shares during the Class Period, Plaintiff and other members of the Class suffered economic loss.

67.    During the Class Period, defendants' false and misleading statements had the intended effect and caused Telik shares to trade at artificially inflated levels throughout the Class Period

68.    As investors and the market became aware of Telik's prior misstatements and omissions and that Telik's actual financial condition and

1   business prospects were, in fact, not as represented; Telik's share price
2   reacted negatively, damaging investors.

3       69.    Had Plaintiff known the truth behind the Company's
4   disclosures they would not have purchased the Company's shares.

### Applicability Of Presumption Of Reliance:
### Fraud-On-The-Market Doctrine

8       70.    At all relevant times, the market for Telik's common stock was
9   an efficient market for the following reasons, among others.

   (a)    Telik's stock met the requirements for listing, and was
          listed and actively traded on the NASDAQ Global
          Market, a highly efficient and automated market;

   (b)    During the Class Period, on average, eight million shares of
          Telik stock were traded on a weekly basis, demonstrating a
          very active and broad market for Telik stock and permitting a
          *very strong* presumption of an efficient market;

   (c)    As a regulated issuer, Telik filed periodic public reports
          with the SEC and the NASDAQ;

   (d)    Telik regularly communicated with public investors via
          established market communication mechanisms,
          including through regular disseminations of press
          releases on the national circuits of major newswire
          services and through other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services;

(e)     Telik was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

(f)     Numerous NASD member firms were active market-makers in Telik stock at all times during the Class Period; and

(g)     Unexpected material news about Telik was rapidly reflected and incorporated into the Company's stock price during the Class Period.

71.     As a result of the foregoing, the market for Telik's shares promptly digested current information regarding Telik from all publicly available sources and reflected such information in Telik's stock price. Under these circumstances, all purchasers of Telik's shares during the Class Period suffered similar injury through their purchase of Telik's shares at artificially inflated prices and a presumption of reliance applies.

### Applicability Of Presumption Of Reliance:
### <u>Affiliated Ute Presumption</u>

72.     In cases where the allegations of wrongdoing are primarily concerned with omissions, the presumption established by the U.S. Supreme

1    Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972)
2    applies. The allegations in this case, taken as a whole, primarily allege the
3    omission of numerous material facts. As the Supreme Court explained,
4    requiring plaintiffs to describe how  they would have behaved had the
5    omitted information been disclosed places an unrealistic burden on
6    plaintiffs.

## NO SAFE HARBOR

8        73.    The  statutory  safe  harbor  provided  for  forward-looking
9    statements under certain circumstances does not apply to any of the
10   allegedly false statements pleaded in this complaint. Many of the specific
11   statements  pleaded  herein  were  not  identified  as  "forward-looking
12   statements" when made.   To the extent there were any forward-looking
13   statements, there were no meaningful cautionary statements identifying
14   important factors that could cause actual results to differ materially from
15   those in the purportedly forward-looking statements. Alternatively, to the
16   extent that the statutory safe harbor does apply to any forward-looking
17   statements pleaded herein, defendants are liable for those false forward-
18   looking statements because at the time each of those forward-looking
19   statements was made, the particular speaker knew that the particular
20   forward-looking statement was false, and/or the forward-looking statement
21   was authorized and/or approved by an executive officer of Telik who knew
22   that those statements were false when made.

## FIRST CLAIM
### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

74.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

75.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Telik's shares at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

76.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Telik's shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

77.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Telik as specified herein.

78.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Telik's value and performance and continued substantial growth, which included the making of, or the participation in the

1   making of, untrue statements of material facts and omitting to state material

2   facts necessary in order to make the statements made about Telik and its

3   business operations and future prospects in the light of the circumstances

4   under which they were made, not misleading, as set forth more particularly

5   herein, and engaged in transactions, practices and a course of business

6   which operated as a fraud and deceit upon the purchasers of Telik's shares

7   during the Class Period.

8       79.    Each of the defendants' primary liability, and controlling

9   person liability, arises from the following facts: (1) the defendants were

10  high-level executives and/or directors at the Company during the Class

11  Period and members of the Company's management team or had control

12  thereof; (2) each of these defendants, by virtue of his responsibilities and

13  activities as a senior officer and/or director of the Company was privy to

14  and participated in the creation, development and reporting of the

15  Company's financial condition; (3) each of these defendants enjoyed

16  significant personal contact and familiarity with the other defendants and

17  was advised of and had access to other members of the Company's

18  management team, internal reports and other data and information about the

19  Company's finances, operations, and sales at all relevant times; and (4) each

20  of these defendants was aware of the Company's dissemination of

21  information to the investing public which they knew or recklessly

22  disregarded was materially false and misleading.

23      80.    The defendants had actual knowledge of the misrepresentations

24  and omissions of material facts set forth herein, or acted with reckless

25  disregard for the truth in that they failed to ascertain and to disclose such

26  facts, even though such facts were available to them.   Such defendants'

27  material misrepresentations and/or omissions were done knowingly or

28  recklessly and for the purpose and effect of concealing Telik's operating

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    34

1  condition and future business prospects from the investing public and
2  supporting the artificially inflated price of its shares. As demonstrated by
3  defendants' overstatements and misstatements of the Company's financial
4  condition throughout the Class Period, defendants, if they did not have
5  actual knowledge of the misrepresentations and omissions alleged, were
6  reckless in failing to obtain such knowledge by deliberately refraining from
7  taking those steps necessary to discover whether those statements were false
8  or misleading.

9      81.   As a result of the dissemination of the materially false and
10 misleading information and failure to disclose material facts, as set forth
11 above, the market price of Telik's shares was artificially inflated during the
12 Class Period. In ignorance of the fact that market prices of Telik's shares
13 were artificially inflated, and relying directly or indirectly on the false and
14 misleading statements made by defendants, or upon the integrity of the
15 market in which the shares trade, and/or on the absence of material adverse
16 information that was known to or recklessly disregarded by defendants but
17 not disclosed in public statements by defendants during the Class Period,
18 Plaintiff and the other members of the Class acquired Telik shares during
19 the Class Period at artificially high prices and were or will be damaged
20 thereby.

21     82.   At the time of said misrepresentations and omissions, Plaintiff
22 and other members of the Class were ignorant of their falsity, and believed
23 them to be true. Had Plaintiff and the other members of the Class and the
24 marketplace known the truth regarding Telik's financial results, which were
25 not disclosed by defendants, Plaintiff and other members of the Class would
26 not have purchased or otherwise acquired their Telik shares, or, if they had
27 acquired such shares during the Class Period, they would not have done so
28 at the artificially inflated prices which they paid.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    35

1      83.   By virtue of the foregoing, defendants have violated Section
2   10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

3      84.   As a direct and proximate result of defendants' wrongful
4   conduct, Plaintiff and the other members of the Class suffered damages in
5   connection with their respective purchases and sales of the Company's
6   shares during the Class Period.

7      85.   This action was filed within two years of discovery of the fraud
8   and within five years of each Plaintiff's purchases of securities giving rise
9   to the cause of action.

## SECOND CLAIM
### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

13     86.   Plaintiff repeats and realleges each and every allegation
14  contained above as if fully set forth herein.

15     87.   The Individual Defendants acted as controlling persons of
16  Telik within the meaning of Section 20(a) of the Exchange Act as alleged
17  herein. By virtue of their high-level positions, and their ownership and
18  contractual rights, participation in and/or awareness of the Company's
19  operations and/or intimate knowledge of the false financial statements filed
20  by the Company with the SEC and disseminated to the investing public, the
21  Individual Defendants had the power to influence and control and did
22  influence and control, directly or indirectly, the decision-making of the
23  Company, including the content and dissemination of the various statements
24  which Plaintiff contends are false and misleading. The Individual
25  Defendants were provided with or had unlimited access to copies of the
26  Company's reports, press releases, public filings and other statements
27  alleged by Plaintiff to be misleading prior to and/or shortly after these
28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    36

1   statements were issued and had the ability to prevent the issuance of the
2   statements or cause the statements to be corrected.

3        88.    In particular, each of these defendants had direct and
4   supervisory involvement in the day-to-day operations of the Company and,
5   therefore, is presumed to have had the power to control or influence the
6   particular transactions giving rise to the securities violations as alleged
7   herein, and exercised the same.

8        89.    As set forth above, Telik, Wick, and Butitta each violated
9   Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this
10  Complaint.

11       90.    By virtue of their positions as controlling persons, the
12  Individual Defendants are liable pursuant to Section 20(a) of the Exchange
13  Act. As a direct and proximate result of defendants' wrongful conduct,
14  Plaintiff and other members of the Class suffered damages in connection
15  with their purchases of the Company's shares during the Class Period.

16       91.    This action was filed within two years of discovery of the fraud
17  and within five years of Plaintiff's purchases of securities giving rise to the
18  cause of action.

19
20                          **THIRD CLAIM**
21                   **Violation Of Section 11 Of**
         **The Securities Act Against All of the Defendants**
22       92.    Plaintiff repeats and realleges each and every allegation
23  contained above as if fully set forth herein.

24       93.    This Claim is asserted against all of the Defendants for
25  violations of §11 of the Securities Act, 15 U.S.C. §77k, on behalf of all
26  purchasers of the Company's common stock issued in connection with or
27  traceable to the Company's 2005 Offering.

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    37

## FOURTH CLAIM
### Violation Of Section 12(a)(2) of the Securities Act
### Against All of the Defendants

101.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

102.    This Claim is asserted against all Defendants for violations of §12(a)(2) of the Securities Act on behalf of plaintiffs and members of the Class who purchased shares in the 2005 Offering.

103.    Each of the Defendants were sellers, offerors, and/or solicitors of sales of the shares offered in connection with the 2005 Offering.

104.    The 2005 Offering Prospectus contained misstatements of material facts, omitted to state facts necessary to make the statements made not misleading, and failed to disclose material facts concerning Telik's business, product development, product commercialization, FDA approval and clinical trials, as set forth herein. The defendants' actions of solicitation included participating in the preparation of the false and misleading 2005 Offering Prospectus and soliciting investors through road show presentations.

105.    Plaintiff and the other members of the Class purchased or otherwise acquired Telik common stock issued pursuant to or traceable to the false and misleading 2005 Offering Prospectus. Plaintiff did not know, or in the exercise of due diligence could not have known, of the untruths and omissions contained in the 2005 Offering Prospectus.

106.    By reason of the conduct alleged herein, Telik, the Defendants violated §12(a)(2) of the Securities Act and plaintiffs and members of the Class have suffered damages as a result of such violations.

107.    Plaintiff, individually and representatively, hereby elect to rescind and tender to those defendants named in this Count those securities that plaintiffs and other members of the Class continue to own, in return for

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          39

1   the consideration paid for those securities together with interest thereon.
2   Plaintiffs and the other members of the class who have sold their Telik
3   common stock seek rescissory damages.

4     108.   This action was brought within one year after the discovery of
5   the untrue statements and omissions and within three years after the 2005
6   Offering.

7

### FIFTH CLAIM
8   ### Violation Of Section 15 of the Securities Act
9   ### Against The Individual Defendants

10    109.   Plaintiffs repeats and realleges each and every allegation
11  contained above as if fully set forth herein.

12    110.   This Claim is asserted against the Individual Defendants for
13  violation of §15 of the Securities Act, 15 U.S.C. §77o.

14    111.   The Individual Defendants, by virtue of their positions as
15  executive officers and directors, stock ownership, and specific acts as
16  described herein, had the power, and exercised the same, to control the
17  representations and actions of Telik.

18    112.   Each of the Individual Defendants was a culpable participant
19  and is jointly and severally liable to plaintiffs and the members of the Class
20  as a "control person" pursuant to §15 of the Securities Act.

21    113.   As a result of the foregoing, plaintiffs and the members of the
22  Class have suffered damages.

23

24    **WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

25      (a)   Determining that this action is a proper class action,
26  designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class

27

28

representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

(b)  Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to every issue so triable.

Dated: June 6, 2007

Respectfully submitted,

**GLANCY BINKOW & GOLDBERG LLP**

Lionel Z. Glancy (SBN #134180)
Michael Goldberg (SBN #188669)
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone: (310) 201-9150
Fax:  (310) 201-9160
E-mail: info@glancylaw.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN# 219683)
Phillip Kim, Esq.
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com

Attorneys for Plaintiff

The Rosen Law Firm P.A.

Signup Form

Certification of Named Plaintiff Pursuant to Federal Securities Laws

First name: Daniel
Last name: Feuer
Address.
City:
State, Zip:
Email:
Phone: .

Plaintiff certifies that:

1. I have reviewed the Complaint and authorized its filing.

2. I did not purchase the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in the securities, which are the subject of this action, during the Class Period set forth in the Complaint are as follows:

Share Purchases:

Purchase Date(s): 04/17/2007  Number of shares: 500  Price per Share: 7.00

Share Sales: .

5. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below.

6. I will not accept any payment for serving as a representative party, except to receive my prorata share of any recovery, or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class

I declare under penalty of perjury that the foregoing are true and correct statements: True
I authorize and retain The Rosen Law Firm P.A. to file an action, or amend a current action, under the federal securities laws to recover damages and to seek relief against Telik, Inc. : True
The Rosen Law Firm will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Complaint and Retention Agreement provided to me is incorporated by reference. True
Clicked to Participate in the Telik, Inc. Action.

6/6/2007